IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NICHOLAS GROSSO,                          *

     *Plaintiff*,                          *

   v.

                   *                    Civil Action No. RDB-24-1432

UNUM LIFE INSURANCE COMPANY
OF AMERICA,                                *

     *Defendant*.                          *

  *    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM OPINION

This action arises from a life insurance policy that Plaintiff Nicholas Grosso ("Plaintiff" or "Dr. Grosso"), a career orthopedic surgeon employed by Center For Advanced Orthopaedics, LLC ("CAO"), purchased from Defendant Unum Life Insurance Company of America ("Defendant" or "Unum"). (ECF No. 13 ¶ 1.) Dr. Grosso submitted disability benefits under his life insurance policy with Unum ("the Policy") after he learned that, due to osteoarthritis in his wrists, he would never be able to perform surgery again. (*Id.*) Dr. Grosso alleges that Unum violated the Policy and underpaid his benefits by more than $500,000 by using his 2020 earnings—which were reduced because of surgery restrictions due to the COVID-19 Pandemic—to calculate his pre-disability income. (*Id.* ¶ 2.)

On March 1, 2024, as a result of the alleged underpayment, Dr. Grosso initiated this action by filing in the Circuit Court for Howard County, Maryland a two-Count Complaint alleging breach of contract and failure to act in good faith pursuant to Maryland statutes. (ECF No. 1 Ex. 2.) On May 16, 2024, Unum timely removed the action to this Court based

on diversity jurisdiction pursuant to 29 U.S.C. § 1332.  (ECF No. 1.)  On May 21, 2024, Unum filed a Motion to Dismiss for Failure to State a Claim (ECF No. 8.)  On June 11, 2024, Dr. Grosso timely filed a First Amended Complaint (ECF No. 13) alleging breach of contract (Count I) and failure to act in good faith pursuant to Maryland's Courts and Judicial Proceedings Article § 3-1701 and Insurance Article § 27-1001 (Count II).  (*Id.*)

Currently pending before this Court are two Motions to Dismiss filed by Unum: (1) Motion to Dismiss For Failure to State a Claim as to the original Complaint ("First Motion to Dismiss" or "Unum's First Motion") (ECF No. 8); and (2) Motion to Dismiss Amended Complaint ("Second Motion to Dismiss" or "Unum's Second Motion") (ECF No. 14). Plaintiff has responded in Opposition (ECF No. 15), and Defendant has replied (ECF No. 18).  The parties' submissions have been reviewed, and no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  For the reasons that follow, Defendant's Motion to Dismiss For Failure to State a Claim as to the original Complaint (ECF No. 8) is MOOT, and Defendant's Motion to Dismiss the Amended Complaint (ECF No. 14) is DENIED.

## **BACKGROUND**

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff."  *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).  Except where otherwise indicated, the following facts are derived from Plaintiff's Amended Complaint and accepted as true for the purpose of Defendant's Motion to Dismiss.

This case arises from a dispute related to Dr. Grosso's life insurance policy with Unum, which he obtained in some part through his employer and policyholder, Center for Advanced Orthopaedics ("CAO").[1]  (ECF No. 13 ¶ 7, 11.)  Dr. Grosso alleges that he has been an orthopedic surgeon for more than twenty five years, and presently serves as President of CAO and a partner of Orthopaedic Associates of Central Maryland ("OACM"), which is a division of CAO.  (*Id.* ¶ 7.)  Dr. Grosso alleges that he suffers from severe bilateral osteoarthritis in his wrists, and, after trying alternative treatments such as activity modification, braces, and corticosteroid injections, he sought surgery to address his condition.  (*Id.* ¶ 9.)  According to Dr. Grosso, he had surgery on his left wrist in September or October 2021 and surgery on his right wrist in January 2022.[2]  (*Id.* ¶¶ 9, 30.)  Dr. Grosso alleges that, after his surgeries, he was advised that he would never again be able to perform surgery.  (*Id.* ¶ 9.)

Dr. Grosso alleges that, at the time of both surgeries, he was insured under a voluntary disability policy, Group Insurance Policy 659439 001("the Policy"), sold by Unum. (*Id.* ¶¶ 11, 13; ECF No. 14-2 at 2.)  Dr. Grosso alleges that Unum consulted a vocational expert, Peter Milne, who opined that orthopedic surgery "involves exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently and/or a negligible amount of force constantly to move objects."  (ECF No. 13 ¶ 10.)  According to Dr.

---

[1]  As explained further below, CAO's involvement in the Policy is at the heart of the parties' dispute.  The parties agree, however, that on the plain language of the Policy itself CAO is identified as the policyholder, *see* (ECF No. 14-2 at 2), and it appears that insureds in some capacity work for CAO or are dependents of those who work in some capacity for CAO, *see* (*id.* at 4).  The Court makes no determination in this Background as to the degree to which CAO was involved in the procurement, establishment, or maintenance of the Policy.
[2]  Dr. Grosso's Amended Complaint also alleges that his first surgery occurred in October 2021.  *Compare* (ECF No. 13 ¶ 9) *with* (ECF No. 13 ¶ 30).  For clarity, the Court refers to both months or to "fall 2021" as the date of Dr. Grosso's first surgery.

Grosso, the Policy was an "own occupation" policy intended to pay benefits for lost income should he become unable to perform surgeries. (*Id.* ¶ 11.) He contends that it is exempt from the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, because his employer did not contribute to or receive profit from the Policy. (ECF No. 13 ¶¶ 11, 12.) Specifically, Dr. Grosso alleges that the Policy falls within the Department of Labor's safe harbor provision, 29 C.F.R. § 2510.3-1(j), exempting some insurance plans from ERISA, because: (1) CAO did not make contributions to the Unum Policy; (2) participation in the Unum Policy was voluntary for employees; (3) CAO's sole function regarding the Unum Policy was to permit Unum to publicize the program without itself endorsing the plan; and (4) CAO received no consideration, cash or otherwise, in connection with the plan. (*Id.* ¶ 14.) Instead, Dr. Grosso alleges, the Policy was sold to physicians by an independent insurance agent, Peter Hibbard ("Hibbard"), and paid for by physicians with after-tax dollars without any contribution, maintenance, or establishment of the Policy from CAO. (*Id.* ¶ 15.)

> Under the Policy, an insured is disabled when:
>
> Unum reasonably determines that:
> - [The insured is] limited from performing the material and substantial duties of [his] regular occupation due to [his] sickness or injury; and
> - [The insured has] a 20% or more loss in [his] indexed monthly earnings due to the same sickness or injury.

(*Id.* ¶¶ 16, 17.)[3] As relevant to the second prong of this definition, the Policy defines "monthly earnings" for CAO Partners as their "average monthly income as an insured partner," and determines such earnings "from the line which shows 'net earnings (loss) from self-employment' from [the insured's] Schedule K-1 of the federal partnership income tax

---

[3] The Policy also provides that loss of a professional license alone does not constitute disability, and Unum may require an insured to undergo examination by a physician. (ECF No. 13 ¶ 16.)

4

return from [his] Employer for the tax year just prior to [his] date of disability[.]"[4]   (*Id.* ¶ 19.)
Dr. Grosso alleges that the phrase "date of disability" is not defined elsewhere in the Policy,
and a disability's "timing" is referenced only in the provision defining "disabled."   (*Id.* ¶ 20.)

Dr. Grosso alleges that before the COVID-19 Pandemic resulted in shutdowns and
reduced non-emergent surgeries, his monthly earnings were approximately $40,000 to
$50,000.   (*Id.* ¶ 21.)   According to Dr. Grosso, however, in March 2020, the Center for
Disease Control ("CDC") and state governments restricted elective surgeries.   (*Id.* ¶ 22.)   Dr.
Grosso alleges that he performed almost exclusively elective surgeries, which Maryland
discontinued pursuant to a Maryland Executive Order dated March 16, 2020.   (*Id.* ¶ 45.)
Additionally, Dr. Grosso alleges, the American College of Surgeons recommended in 2020
that surgeons "should thoughtfully review all scheduled elective procedures with a plan to
minimize, postpone, or cancel electively scheduled operations" based on the ongoing
pandemic.   (*Id.* ¶ 22.)   Dr. Grosso alleges that nonurgent procedures began to return to
typical levels only after the Food and Drug Administration authorized the COVID-19
vaccine on December 11, 2020.   (*Id.* ¶ 23.)   According to Dr. Grosso, these conditions
meant that he could not perform surgery for much of 2020, and his surgical income—which
is based on collections—dropped approximately 50% that year.   (*Id.* ¶¶ 24, 25.)   Similarly,
Dr. Grosso alleges, OACM experienced extreme financial hardship such that Dr. Gross and
his partners could not take certain scheduled draws.   (*Id.* ¶ 25.)   Dr. Grosso alleges that his
income did not return to its typical levels until 2021.   (*Id.* ¶ 26.)

---

[4]  The Policy calculates monthly earnings differently for individuals who have not been a partner for the most
recent federal partnership income tax return filing year, but this is not relevant to Dr. Grosso, who apparently
was a partner for the relevant period.  *See* (ECF No. 13 ¶¶ 7, 40.)

Dr. Grosso alleges that his 2020 Schedule K-1 lists his self-employment earnings for 2020 as $305,639, and Unum used this number to calculate his basic monthly benefit after receiving his disability claim. (*Id.* ¶¶ 27, 28.) Specifically, Dr. Grosso alleges that Unum divided his 2020 self-employment earnings of $305,639 by 12 and reached a basic monthly benefit of $25,469.92. (*Id.* ¶ 28.) Dr. Grosso alleges that this monthly benefit figure comports with his testimony that the COVID-19 Pandemic reduced his personal income by approximately 50 percent. (*Id.* ¶ 29.) Dr. Grosso alleges, however, that his 2021 Schedule K-1 lists his 2021 "self-employment earnings" as $473,020, even though he only performed surgeries before he had surgery himself in September or October 2021. (*Id.* ¶ 30.) According to Dr. Grosso, if Unum had used his 2021 Schedule K-1 as required under the Policy, his indexed basic monthly benefit would have been $39,418.33. (*Id.* ¶ 31.)

Dr. Grosso alleges that, based on his claim under the Policy, he has received payments equal to $100,000, but he has been out of performing surgery since September 9, 2023, and paid premiums with the expectation that the policy would replace 50% of his monthly income of $40,000 to $50,000.[5] (*Id.* ¶ 34.) According to Dr. Grosso, Unum made three payments of $6,348.92 on March 19, 2022; March 29, 2022; and April 5, 2022, which were supposed to cover the period between December 8, 2021, and April 7, 2022. (*Id.* ¶ 32.) Dr. Grosso alleges that Unum then made a payment of $60,953.24 on June 8, 2022, and $20,000 on June 30, 2022, after retroactively recalculating his pre-disability earnings based on Dr. Grosso's Schedule K-1 for his management income. (*Id.* ¶ 33.) Dr. Grosso alleges this

---

[5] Dr. Grosso's Amended Complaint does not provide any detail regarding when or how he made his claim under the Policy.

recalculation was not based on his income as an orthopedic surgeon. (*Id.*) According to Dr. Grosso, he has not received any payments from Unum since June 30, 2022. (*Id.*)

Dr. Grosso alleges that Unum "did not explain its position for months,"[6] and ultimately stated that it did not owe a benefit from the period between December 8, 2021, and January 7, 2022, because Dr. Grosso had not yet lost earnings of at least 20%. (*Id.* ¶ 35.) Dr. Grosso provides in his Amended Complaint an excerpt of an apparent communication from Unum,[7] which provides that Unum's Financial Consultant used Dr. Grosso's 2020 Schedule K-1 from CAO Central Maryland to calculate his benefits. (*Id.*) The excerpt also provides that Unum determined no benefit was due for that period because Dr. Grosso's "RTW Earnings . . . for the period in question exceed the earnings loss percentage to qualify for a benefit." (*Id.*) Dr. Grosso alleges that Unum's position ignores that he was not yet disabled under the terms of the Policy. (*Id.* ¶ 36.) Specifically, Dr. Grosso alleges that under the Policy's definition of disabled, he was not disabled until January 8, 2022. (*Id.* ¶¶ 37–38.) According to Dr. Grosso, Unum prepared a chart in its Cumulative Calculation of Benefits document that reflected this date as the date upon which Dr. Grosso experienced a 20% loss of his earnings. (*Id.* ¶¶ 37, 39.)

Dr. Grosso alleges, therefore, that under the plain terms of the Policy his benefits should have been based on his pre-disability earnings in 2021, as reflected in his 2021 Schedule K-1. (*Id.* ¶¶ 40, 41.) According to Dr. Grosso, he should have received a benefit

---

[6]  This phrasing seems to suggest that Dr. Grosso disputed Unum's payments, but Dr. Grosso does not provide any detail regarding his communications with Unum.

[7]  The Amended Complaint does not provide the full document from which the excerpt is taken, the title of that document, or the date of the communication. The excerpt appears to include a request from Dr. Grosso or a representative: "Please advise why the benefit reduction for the period of 12/8/21 through 1/7/22 was reduced for the entire benefit amount of $12,734.96." (ECF No. 13 ¶ 35.) It also appears to contain Unum's response to that request. (*Id.*)

payment of $19,709 per month since January 2022, resulting in a total payment to the date of the filing of his Amended Complaint of $512,434.  (*Id.* ¶ 42.)  Dr. Grosso alleges, however, that he has only received $100,000 in benefits payments, such that he has been underpaid by approximately $400,000, and the amount of the underpayment grows each month that passes without further payment.  (*Id.* ¶¶ 42, 43.)  Dr. Grosso alleges that Unum has not resumed its payments and continues to base its calculations on his 2020 Schedule K-1, rather than his 2021 Schedule K-1.  (*Id.* ¶ 44.)  Dr. Grosso alleges that Unum's disability payments are disproportionate to the premiums that he paid based on his typical salary outside the year 2020, and insureds did not receive a premium rebate to reflect their artificially deflated income in 2020.  (*Id.* ¶¶ 45, 59.)  According to Dr. Grosso, Unum told him that he should have received a premium benefit for his 2020 earnings, but he did not.  (*Id.* ¶¶ 62, 63.)  Moreover, he alleges that the Unum Policy is an "own occupation" policy meant to replace his earnings as a surgeon, but Unum has repeatedly attempted to use in its calculations his income from other activities.  (*Id.* ¶ 48.)

Plaintiff further alleges that Unum failed to act in good faith under Maryland law.  (*Id.* ¶ 49.)  He alleges that Unum failed to provide a reasonable explanation for refusing to pay benefits since June 2022 and only admitted that it relied on his 2020 income in December 2022, after "repeated prodding" from the Maryland Insurance Administration ("MIA").  (*Id.* ¶¶ 50, 51.)  Dr. Grosso alleges that Unum violated Maryland law by misrepresenting facts to the MIA, and Unum's failure to pay the claim based on his typical income was arbitrary in capricious in violation of the Policy and Maryland law.  (*Id.* ¶¶ 52–53.)  Additionally, Dr. Grosso alleges that Unum has continued to engage in bad faith conduct by failing to provide

further payments pending the resolution of his administrative action before the MIA. (*Id.* ¶ 54.) He alleges that Unum promised on its website to pay benefits that accounted for pre-COVID-19 Pandemic earnings. (*Id.* ¶ 60.)

Accordingly, Dr. Grosso initiated this action on March 1, 2024, by filing a two-Count Complaint in the Circuit Court for Howard County, Maryland. (ECF No. 1.) Unum timely removed to this Court based on diversity jurisdiction under 28 U.S.C. § 1332, *see* (ECF No. 1), and filed its Motion to Dismiss For Failure to State a Claim (ECF No. 8). Dr. Grosso then filed an Amended Complaint (ECF No. 13), alleging breach of contract (Count I) and failure to act in good faith under Maryland law (Count II).[8] (ECF No. 13 at 17, 18.) In Count I, he alleges that the Policy is a valid contract with which he fully complied, and Unum breached that contract in several ways, including: (a) miscalculating his pre-disability income and date of disability; (b) failing to pay benefits in accordance with the terms of the policy and the premiums charged; (c) refusing to pay benefits during the pendency of his MIA action against Unum; and (d) insisting that his income from non-surgical positions should be credited against his disability payments despite the fact that the Policy covers only his income as a surgeon. (*Id.* ¶ 68.) In Count II, Dr. Grosso alleges failure to act in good faith pursuant to Maryland Courts and Judicial Proceedings Article § 3-1701 and Maryland Insurance Article § 27-1001. (*Id.* ¶¶ 72, 75.) Dr. Grosso alleges that Unum failed to act in good faith because it knew that he had not qualified as disabled under the policy until January 2022 but still based his benefit payments on his reduced 2020 income. (*Id.* ¶ 73.)

---

[8] Dr. Grosso also alleges that he is filing a "Petition for Judicial Review of the decision of the Maryland Insurance Administration" ("MIA"). (ECF No. 13 at 1.) Dr. Grosso does not cite or provide a copy of that decision, and he does not indicate whether the MIA Commissioner is on notice of this action as necessary to comply with Maryland's Insurance Article § 2-215(g). *See* Md. Code Ann., Ins. § 2-215(g)(1)–(3) (imposing on MIA Commissioner obligations, upon notice, to file documents in court in which appeal is pending).

Dr. Grosso alleges that he has exhausted his administrative remedies in an appeal and hearing before the MIA.  (*Id.* ¶ 75.)  Finally, he alleges that Unum's failure to provide payments during the pendency of the MIA action is against its good faith obligations.  (*Id.* ¶ 74.)

In response to Dr. Grosso's Amended Complaint (ECF No. 13), Unum timely filed a Motion to Dismiss Amended Complaint (ECF No. 14) pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dr. Grosso responded in opposition (ECF No. 15), and Unum has replied (ECF No. 18).  This matter is now ripe for review.

## **STANDARD OF REVIEW**

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted.  The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (quoting *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  A complaint need not include "detailed factual allegations."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  A

complaint must, however, set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 556 U.S. at 678; *see A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011).

## ANALYSIS

In its Second Motion to Dismiss (ECF No. 14), Unum argues that ERISA governs this dispute such that the breach of contract claim in Count I must be converted to a claim to recover benefits under an employee benefit plan pursuant to 29 U.S.C. § 1132(a)(1)(B), and the failure to act in good faith claim in Count II must be dismissed as preempted by ERISA. (ECF No. 14 at 2.) Specifically, Unum contends that Dr. Grosso's employer, Center for Advanced Orthopaedics, LLC ("CAO"), negotiated and purchased the group Policy under which Dr. Grosso's alleged benefits arose, and thus the Policy is subject to ERISA. (ECF No. 14-1 at 2–3.) These arguments are identical to—though significantly more detailed than—those raised in Unum's First Motion to Dismiss as to Dr. Grosso's original Complaint (ECF No. 8). Dr. Grosso has responded only to Unum's Second Motion to Dismiss, and has not addressed the First Motion to Dismiss, which remains pending. Accordingly, before reaching Unum's arguments as to dismissal of the Amended Complaint, the Court addresses the appropriate disposition of Unum's First Motion to Dismiss.

### A.  Motion to Dismiss (ECF No. 8)

"Ordinarily, an amended complaint supersedes those that came before it." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021).  Thus, this Court has held that the filing of an Amended Complaint renders moot pending motions to dismiss the original complaint as long as the Amended Complaint addresses the issues raised in the prior motion to dismiss. *See Howard v. Ocwen Loan Servicing, Inc.*, RDB-18-3296, 2019 WL 4750333, at *2 (D. Md. Sept. 30, 2019); *see also Verderamo v. Mayor & City Council of Balt.*, 4 F. Supp. 3d 722, 724 n.3 (D. Md. 2014).  In this case, however, Unum's Second Motion to Dismiss raises the same arguments, albeit in greater detail, as its First Motion to Dismiss, suggesting that the Amended Complaint did not address the alleged deficiencies Unum identified.  *Compare* (ECF No. 8) *and* (ECF No. 14).  Even so, Dr. Grosso has replied only to the arguments as raised in Unum's Second Motion to Dismiss.  *See* (ECF No. 15.)  Accordingly, this Court will consider all arguments advanced by Unum in support of dismissing Dr. Grosso's claims, but Unum's First Motion to Dismiss (ECF No. 8) will be deemed MOOT.[9]  *See, e.g.*, *Reese v. H&S Bakery, Inc.*, RDB-17-3085, 2018 WL 4005226, at *4 (D. Md. Aug. 22, 2018) (construing as moot first motion to dismiss that raised same arguments as second motion).

### B.  Motion to Dismiss Amended Complaint (ECF No. 14)

The crux of the parties' dispute regarding Unum's Second Motion to Dismiss is whether the Policy is governed by ERISA such that state law claims must be converted to

---

[9]  Ordinarily, failure to respond to an opposing party's argument in a motion to dismiss constitutes waiver of that point.  *See Ferdinand-Davenport v. Child.'s Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010).  In this case, however, neither party has raised any argument regarding mootness or waiver.  Moreover, because both of Unum's Motions to Dismiss raise identical arguments separated by Dr. Grosso's intervening Amended Complaint, Dr. Grosso's response in Opposition to Unum's Second Motion to Dismiss substantively addresses the arguments in Unum's First Motion to Dismiss.

ERISA claims or dismissed.  Unum contends that the Policy is governed by ERISA because, by its plain language, it describes itself as subject to ERISA, and it does not meet ERISA's safe harbor exception.  (ECF No. 14-1 at 2–3, 4–5.)  Unum also contends that the Policy is covered by ERISA because "[b]enefit plans that cover both working owners/partner sand working non-owner/partner employees are governed by ERISA law and pre-emption." (ECF No. 14-1 at 6.)  In support of this argument, Unum cites *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004).  *Hendon*, however, merely held that if a plan *already definitively covered by ERISA* "covers one or more employees other than the business owner or his or her spouse, the working owner may participate on equal terms with the other plan participants."  *Id.* at 6.  That is, the business owner could take advantage of ERISA protections afforded to other plan participants.  *Id.*  As such, *Hendon*, which dealt with a dispute regarding who qualified as an "employee" able to participate in a benefit plan undisputedly covered by ERISA, has no clear application to this case in which Dr. Grosso disputes whether the plan is subject to ERISA in the first place.

In Opposition (ECF No. 15), Dr. Grosso contends that the Policy meets ERISA's safe harbor provision because he obtained it through an independent broker, CAO made no contributions to the policy, and employee participation was voluntary.  (*Id.* at 8.) Additionally, Dr. Grosso argues that dismissal based on potential ERISA preemption would be premature because such preemption necessarily requires a fact-intensive inquiry.  (*Id.* at 11.)  In reply, Unum argues that no factual disputes exist because the language of the Policy itself establishes that it is governed by ERISA, and Plaintiff has not sufficiently alleged that CAO was not involved in administration of the policy such that the safe harbor would apply.

13

(ECF No. 18 at 2–3, 4–5.)    Accordingly, the resolution of Unum's Second Motion to Dismiss, which asserts dismissal only based on ERISA preemption, hinges on whether ERISA applies to the Policy.

As Judge Xinis of this Court has recognized, "ERISA is a 'comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans.'" *Shrago v. Unum Life Ins. Co. of Am.*, Civ. No. PX-20-1097, 2021 WL 3188320, at *4 (D. Md. July 28, 2021) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)). "ERISA applies to all employee benefit plans that are established or maintained by an employer 'engaged in commerce or in any industry or activity affecting commerce,' an employee organization, or both." *Custer v. Pan. Am. Life Ins. Co.*, 12 F.3d 410, 417 (4th Cir. 1993) (quoting 29 U.S.C. § 1003(a).  As such, ERISA provides a "uniform body of benefits law," *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990), that preempts "all laws, decisions, rules, regulations, or other State action having effect of law, of any State," 29 U.S.C. § 1144(a).  The party asserting ERISA preemption bears the burden to establish that ERISA governs the policy at issue.  *Shrago*, 2021 WL 3188320, at *4 (citing *Great-W. Life & Annuity Ins. Co. v. Info. Sys. & Networks Corp.*, 523 F.3d 266, 270 (4th Cir. 2008)).

ERISA defines an employee benefit plan to include plans, funds, or programs "established or . . . maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, . . . ."  29 U.S.C. § 1002(1).  The Supreme Court has suggested that ERISA applies where "[a]n employer that makes a commitment systematically to pay certain benefits undertakes a host

14

of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements." *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 9 (1987). The U.S. Court of Appeals for the Fourth Circuit has further clarified that ERISA applies only to "(1) a plan, fund or program, (2) established or maintained (3) by an employer, . . . (4) for the purpose of providing a benefit, (5) to employees or their beneficiaries." *Custer*, 12 F.3d at 417 (citing *Donovan v. Dillingham*, 688 F.2d 1367, 1371 (11th Cir. 1982)). In this case, the parties dispute the extent to which CAO, as Dr. Grosso's employer, "established or maintained" the Policy at issue. This is fundamentally a factual question that must await discovery in this case.

To clarify the scope of the "established or maintained" element, the Department of Labor promulgated a "safe harbor" regulation, 29 C.F.R. § 2510.3–1(j), that provides circumstances under which an employer's involvement is too minimal to subject a plan to ERISA. *See* 40 Fed. Reg. 34,527 (1975) (explaining purpose of safe harbor regulation). Under the safe harbor:

> The term 'employee welfare benefit plan' shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which:
>
> (1) No contributions are made by an employer or employee organization;
> (2) Participation [in] the program is completely voluntary for employees or members;
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than

15

reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3–1(j). A party seeking to avoid preemption must satisfy all four of the safe harbor elements to escape ERISA. *United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986). In this case, Unum challenges only the first and third elements of the safe harbor.[10] (ECF No. 14-1; ECF No. 18.) Dr. Grosso asserts that dismissal is improper or premature because he has sufficiently alleged that the Policy falls within the safe harbor such that ERISA does not apply. (ECF No. 15 at 6–12.)

Before applying the safe harbor framework to the alleged facts of this case, the Court notes that the parties cite almost exclusively to authority deciding motions for summary judgment. For this reason, it seems prudent to reiterate the standard for dismissal at this early stage of litigation: A complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely," *Twombly*, 550 U.S. at 556 (internal quotations omitted), but "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. When considering a motion to dismiss based on an ERISA preemption dispute, district courts in the Fourth Circuit have declined to grant motions to dismiss unless they can determine that "Plaintiff

---

[10] Dr. Grosso alleges that participation in the Unum Policy was voluntary for employees, which goes to the second element of the safe harbor. (ECF No. 13 ¶¶ 11, 14); 29 C.F.R. § 2510.3–1(j)(2). Unum does not dispute this contention. Accordingly, the Court concludes that Plaintiff has alleged facts sufficient to meet the second element of the safe harbor regulation at this early stage of litigation.

Similarly, Dr. Grosso alleges that, as to the fourth element of the safe harbor exception, CAO did not receive "consideration in the form of cash or otherwise in connection with the program." (ECF No. 13 ¶ 14.) Unum does not contest this allegation and raises no arguments regarding the fourth element of the safe harbor. Accordingly, the Court concludes that Plaintiff has alleged facts sufficient to meet the fourth element of the safe harbor at this early stage of litigation.

will be unable to develop evidence during discovery showing that the contributory policy falls within the 'safe harbor' provision, 29 C.F.R. § 2150.3-1(j)[.]"  *Gardner v. E.I. Dupont De Nemours & Co.*, 939 F. Supp. 471, 476 (S.D.W. Va. 1996).  With this standard in mind, the Court evaluates each disputed element of the safe harbor provision in turn.

### 1. Safe Harbor Element One: Whether CAO contributed to the Policy

Unum argues that CAO constructively contributed to the Policy by purchasing a disability coverage package for multiple classes of Physician employees such that it was able to negotiate a unitary rate structure for its employees.  (ECF No. 14-1 at 7.)  In response, Dr. Grosso cites his reiteration of the elements of the safe harbor in his Amended Complaint and argues that the group discount did not result from CAO's "effort and involvement" such that it violates the safe harbor.  (ECF No. 15 at 9 (quoting *Shrago*, 2021 WL 3188320, at *6).)

Although the safe harbor clearly provides that an employer may not contribute to an insurance plan, courts have struggled to define the scope of employer action that constitutes a contribution under the first element of the safe harbor.  Most courts have recognized that payment of policy premiums using pre-tax income alone is not sufficient to constitute employer contribution.  *See Turner v. Liberty Nat'l Life Ins. Co.*, 2012 WL 711357, at *4 (E.D. Tenn. Mar. 5, 2012) (holding payroll deduction to pay premiums using pre-tax dollars is not sufficient to constitute employer contribution under ERISA); *Gooden v. Unum Life Ins. Co. of Am.*, 181 F. Supp. 465, 473–74 (E.D. Tenn. 2016) (collecting cases holding payroll deduction alone is not enough to constitute employer contribution).  *But see Brown v. Paul Revere Life Ins. Co.*, 2002 WL 1019021, at *5 (E.D. Pa. May 20, 2002) (holding payroll deductions are

sufficient to constitute contributions in violation of first element of ERISA safe harbor). Greater dispute exists, however, as to whether an employer-negotiated premium discount amounts to employer contribution. *See Gooden*, 181 F. Supp. at 473–74 (collecting cases); *see also Moore v. Life Ins. Co. of N. Am.*, 708 F. Supp. 2d 597, 607 (N.D.W. Va. 2010) (holding benefitting from unitary rate structure constitutes employer contribution).  Judge Xinis of this Court has recognized that discounted premiums constitute employer contributions only where they occurred "on account of an employer's effort and involvement."  *Shrago*, 2021 WL 3188320, at *6 (citing *Healy v. Minn. Life Ins. Co.*, 2012 WL 566759, at *5 (W.D. Mo. Feb. 21, 2012)); *see also Gooden*, 181 F. Supp. at 475.  Similarly, other district courts have noted that "a discounted rate is the very essence of a group insurance plan—it is what distinguishes it from an individual policy"—such that discounts alone may not constitute employer contributions. *Revello v. Paul Revere Life Ins. Co.*, 224 F. Supp. 2d 946, 949 n.3 (E.D. Pa. 2002).

In this case, although Dr. Grosso provides very limited detail regarding the initial negotiation and purchase of the policy in his Amended Complaint,[11] he clearly alleges that (1) CAO does not contribute to or profit from the Policy; (2) the Policy was paid for by the physicians with after-tax dollars; and (3) Physicians purchased the policy not from CAO but from an independent insurance agent Hibbard.  (ECF No. 13 ¶¶ 11, 14, 15.)  Unum appears to acknowledge this by admitting "Physicians in Maryland, D.C., and Virginia may pay their

---

[11]  In his Opposition, Dr. Grosso attaches and cites to an affidavit from Peter Hibbard.  (ECF No. 15 at 4; ECF No. 15-1.)  To consider matters outside the pleadings—including Hibbard's affidavit—on a Motion to Dismiss pursuant to Rule 12(b)(6), a court must convert the motion into one for summary judgment.  *See Carter v. Balt. Cnty., Md.*, 39 F. App'x 930, 933 (4th Cir. 2002) (explaining consideration of materials outside the pleadings on a motion to dismiss pursuant to Rule 12(b)(6)); *see also* FED. R. CIV. P. 12(b).  In this case, the Court declines to convert this motion to dismiss—filed well before the parties have had the opportunity to conduct discovery—into a motion for summary judgment.  Accordingly, the Court does not consider the Hibbard affidavit.

own premiums for disability coverage made available by CAO under its Group Policy . . . ." (ECF No. 14-1 at 7.) At this early stage of litigation, in which all inferences must be drawn to favor Dr. Grosso as the non-moving party, Dr. Grosso's allegations that CAO did not contribute to or sell him the Policy is sufficient to meet the first element of the safe harbor. *See, e.g., Shrago*, 2021 WL 3188320, at *7 (noting that an independent broker negotiated the policy, which favored safe harbor application). To be clear, the Court makes no determination regarding whether the Policy meets the first element of the safe harbor regulation or not. Rather, the Court merely concludes that, at this pleading stage, Dr. Grosso has alleged facts to sufficient to plead this element of the safe harbor.

> **2. Third Element of Safe Harbor: Whether sole functions of employer are publication without endorsement and collection of premium through payroll deductions and remission to insurer**

Dr. Grosso clearly alleges that CAO did not sell the Policy to him or endorse the Policy in any way. (ECF No. 13 ¶¶ 11, 14.) Unum argues, however, that CAO exceeded the limits of the third safe harbor element by (1) defining and controlling the classes of employees eligible to participate in the benefit; (2) defining different benefits for different classes of eligible employees; (3) monitoring and recordkeeping eligible and enrolled employees and providing monthly reports to Unum since 2018; and (4) calculating and remitting to Unum the total negotiated premium for enrolled employees each month. (ECF No. 18 at 3.) Dr. Grosso does not directly address Unum's contention that CAO determined which classes of employees were eligible for benefits under the plan, and the Policy itself provides that eligible groups include: "All Active Physicians except Divisions 2, 5, 12, 13, 14, 19, 20, 22, 28, 31, 34, 37, and C-3 in active employment in the United States

with the Employer." (ECF No. 14-2 at 4.) The Policy also includes a minimum hours requirement and waiting period. (*Id.*) Finally, the Policy provides different types of benefits to partner Physicians and non-partner Physicians. (ECF No. 14-2 at 4, 16.)

The Supreme Court has clarified that the critical inquiry governing "establishment and maintenance" of a policy such that it falls under ERISA is the creation of an administrative scheme to administer benefits. *Coyne*, 482 U.S. at 9–10. The Fourth Circuit has emphasized that, under the third prong of the ERISA safe harbor, "employers can only assume a very limited role with respect to the plan" before their actions constitute an administrative scheme sufficient to invoke ERISA. *Casselman v. Am. Fam. Life Assurance Co. of Columbus*, 143 F. App'x 507, 509 (4th Cir. 2005). Where an employer selects the type of employees eligible for the program and reviews the plans available, most Circuits conclude that the employer exceeds its permissible role under the third prong of the safe harbor. *See, e.g.*, *id.* at 509–510; *Menkes v. Prudential Ins. Co. of Am.*, 762 F.3d 285, 290–91 (3d Cir. 2014); *Simas v. Quaker Fabric Corp. of Fall River*, 6 F.3d 849, 851 (1st Cir. 1993); *see also Kulinski v. Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 257 (8th Cir. 1994) (discussing employer control of eligibility as action that may exceed limitations of safe harbor exception). This consensus reflects that a plan should be subject to ERISA where the employer's conduct would lead an employee "reasonably to conclude that a particular group insurance program is part of a benefit arrangement backed by the company." *Johnson v. Watts Regul. Co.*, 63 F.3d 1129, 1134 (1st Cir. 1995); *see also Gross v. Sun Life Assurance Co. of Canada*, 734 F.3d 1 (1st Cir. 2013) (collecting cases noting that activity creating outward appearance of employer administration is significant in determining ERISA's application).

As an initial matter, CAO's alleged role in monitoring, recordkeeping, and providing reports are ministerial tasks not sufficient at this stage to deprive the policy of the protection of the safe harbor. *See Johnson*, 63 F.3d at 1134 ("Thus, as long as the employer merely advises employees of the availability of group insurance, accepts payroll deductions, passes them on to the insurer, and performs other ministerial tasks that assist the insurer in publicizing the program, it will not be deemed to have endorsed the program under section 2510.3-1(j)(3)."). Unum asserts that CAO decided which classes of employees would be eligible and set different benefits based on partner and non-partner employees. The sole evidence Unum offers of such eligibility determinations is one page of the Policy defining eligibility and an amendment limiting eligibility to certain employees. In cases in which courts have determined that employers exceeded the limitations of the third element of the safe harbor, there has been significant evidence—such as a memo issued by the employer to the employees describing eligibility or an employer drafting the plan's eligibility requirements—of eligibility determinations by employers. *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1210, 1213–14 (11th Cir. 1999); *Moore*, 708 F. Supp. 2d at 608–09; *see also Casselman*, 143 F. App'x at 509–510 (explaining defining eligibility *and* selecting plan favored finding plan governed by ERISA).

Unum contends that the language of the Policy allegedly negotiated by CAO itself makes clear that (1) the Policy is governed by ERISA; (2) CAO is the plan administrator;[12]

---

[12]  Although Unum asserts the Policy identifies CAO as the plan administrator, the provisions of the Policy to which Unum cites do not support this assertion. Rather, the cited provisions name CAO as the policyholder, which is distinct from a plan administrator, and often reference separately an "Employer" and "Plan Administrator." *See* (ECF No. 14-1 at 3; ECF No. 14-2 at 28 ("This service is also available to your Employer . . . Information about this program can be obtained through your plan administrator."), at 38 ("If ERISA applies, the following items constitute the Plan: the additional information contained in this

(3) disability claims under the Policy are subject to administrative protections under ERISA; and (4) CAO is bound to perform routine and ongoing administration of the plan by monitoring benefit eligibility and election, reporting monthly to Unum, and calculating and remitting the appropriate negotiated premium. *See* (ECF No. 18 at 4–5; ECF No. 14-1 at 2–3). In support of these arguments, Unum cites to various sections of the Policy itself. It is not clear at this pleading stage, however, that the Policy explicitly provides that it will be subject to ERISA. The provisions to which Unum cites provide that the Policy is governed by ERISA "to the extent applicable." *See, e.g.*, EF No. 14-2 at 2. Moreover, as discussed above, an employer's acceptance of responsibility to remit premiums and monitor a benefits plan is not necessarily sufficient to constitute "establishment and maintenance" of a plan in violation of the safe harbor limitations. *See Johnson*, 63 F.3d at 1134.

At this pleading stage, Dr. Grosso has alleged facts sufficient to meet the third element of the safe harbor. Although Unum cites the contract language defining eligible employees and argues that CAO in 2022 amended the Policy benefits to exclude Physicians in Corporate Divisions, (ECF No. 14-1 at 2, 2 n.3; ECF No. 14-3), at this early stage it is not clear whether CAO had any greater involvement.[13] Dr. Gross alleges that the policy was sold by an independent agent, which suggests that CAO did not select the insurance company. *See Casselman*, 143 F. App'x at 510 ("Both determining eligibility criteria and

---

document, the policy, including your certificate of coverage, and any additional summary plan description administration provided by the Plan Administrator.").) Notably, the Policy's glossary (ECF No. 14-2 at 30–33), does not define "plan administrator." As such, the Policy itself does not provide information sufficient to determine that CAO is the Plan Administrator at this early stage of litigation, where all inferences must be drawn to favor Dr. Grosso as the non-moving party.

[13] The critical inquiry as to Unum's Motion to Dismiss is whether Dr. Grosso has alleged facts sufficient to raise a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

selecting the insurance company have been found relevant to the determination of whether the safe harbor is applicable."). At this early stage of litigation, Dr. Grosso has pleaded facts sufficient to allege the third element of the safe harbor.[14]

Accordingly, Dr. Grosso has pleaded facts sufficient to allege that the Policy meets the four required elements of ERISA's safe harbor exception. Unum's Motion to Dismiss based on ERISA preemption is DENIED.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss Amended Complaint pursuant to Rule 12(b)(6) (ECF No. 14) is DENIED. Additionally, as explained above, Defendant's Motion to Dismiss (ECF No. 8) is MOOT.

A separate Order follows.

/s/
_____
Richard D. Bennett
United States Senior District Judge

Dated: March 25th, 2025

---

[14]   Unum argues that the integral insurance contract makes clear that ERISA applies such that further discovery is not needed to determine the applicability of ERISA. As explained above, however, the insurance contract language is not so unequivocal as to eliminate the possibility that the safe harbor exception may apply. Moreover, courts in the Fourth Circuit have recognized that the applicability of the ERISA safe harbor exception may be difficult to discern on a factually undeveloped record at the motion-to-dismiss stage. *See, e.g.*, *Gardner v. E.I. Dupont De Nemours & Co.*, 939 F. Supp. 471, 476 (S.D.W. Va. 1996).